Case No. 13-15183-CC

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

_____

JAMIE ROURK,
Appellant-Plaintiff,

v.

BANK OF AMERICA, N.A.,
Appellee-Defendant.
_____

Appeal from the United States District Court
for the Middle District of Georgia

**JAMIE ROURK'S BRIEF**

Michael B. Terry
Naveen Ramachandrappa
Bondurant, Mixson & Elmore, LLP
1201 W Peachtree St NW
Ste 3900
Atlanta, GA 30309
404-881-4100

Charles A. Gower
Miranda J. Brash
Charles A. Gower, P.C.
1425 Wynnton Rd
PO Box 5509
Columbus, GA 31906
706-324-5685

**Attorneys for Jamie Rourk**

Case No. 13-15183-CC
Jamie Rourk v. Bank of America, N.A.

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1-2, Rourk filed her initial Certificate of Interested Persons and Corporate Disclosure Statement on November 26, 2013.  Upon discovering that certain counsel of record were inadvertently omitted from the initial Certificate, Rourk filed an Amended Certificate of Interested Persons and Corporate Disclosure Statement on December 2, 2013.

Pursuant to Rule 26.1-1, Rourk includes a Certificate of Interested Persons and Corporate Disclosure Statement with this first brief.  Rourk has combined the persons and entities from her initial and amended certificates, so that there is one complete list for this brief.

The following trial judges, attorneys, persons, associations of persons, firms, partnerships, and corporations are known to have an interest in the outcome of this case or appeal:

- 100 Federal Street Limited Partnership

- 201 North Tryon, LLC

- 214 North Tryon, LLC

- Abell, Teresa Thomas

- Abilene Park, Inc.

Case No. 13-15183-CC
Jamie Rourk v. Bank of America, N.A.

- Alamo Funding II, Inc.

- Amarillo Lane, Inc.

- Anzac Peaks, Inc.

- Asset Backed Funding Corporation

- Asset Transition Management Services, Inc.

- BA Auto Securitization Corporation

- BA Capital Company, L.P.

- BA Equity Holdings, L.P.

- BA Financial Trading (Luxembourg) S.a.r.l.

- BA Leasing BSC, LLC

- BA Properties, Inc.

- BA SBIC Sub, Inc.

- BA Venture Management Corporation

- BAC North America Holding Company

- BAC Retail Group LLC

- BAL Energy Holding, LLC

- BAL Energy Management II, LLC

- BAL Energy Management, LLC

Case No. 13-15183-CC
Jamie Rourk v. Bank of America, N.A.

- BAL Solar I, LLC

- BAL Solar II, LLC

- BAL Solar III, LLC

- BAMS Solutions, Inc.

- BANA (Gibraltar) Holdings Limited

- BANA Alberta Funding Company, ULC

- BANA Canada Funding Company Ltd.

- BANA Defeasance Holding Company LLC

- BANA GA Mortgage Company

- BANA Holding Corporation

- BANA Residuals, LLC

- BancBoston Aircraft Leasing Inc.

- BancBoston Insurance Agency of Rhode Island, Inc.

- BancBoston Leasing Services Inc.

- BancBoston Ventures Inc.

- Banc of America Advisory Services, LLC

- Banc of America Arena Community Development LLC

- Banc of America CDE I, LLC

Case No. 13-15183-CC
Jamie Rourk v. Bank of America, N.A.

- Banc of America CDE II, LLC

- Banc of America CDE III, LLC

- Banc of America CDE IV, LLC

- Banc of America CDE V, LLC

- Banc of America CDE, LLC

- Banc of America Commercial, LLC

- Banc of America Community Development Corporation

- Banc of America Credit Products, Inc.

- Banc of America E-Commerce Holdings, Inc.

- Banc of America FSC Holdings, Inc.

- Banc of America Funding Corporation

- Banc of America Historic New Ventures, LLC

- Banc of America Insurance Services, Inc.

- Banc of America Investment Advisors, Inc.

- Banc of America Leasing & Capital, LLC

- Banc of America Merrill Lynch Commercial Mortgage Inc.

- Banc of America Merrill Lynch Large Loan, Inc.

- Banc of America Mortgage Securities, Inc.

Case No. 13-15183-CC
Jamie Rourk v. Bank of America, N.A.

- Banc of America Neighborhood Services Corporation

- Banc of America Preferred Funding Corporation

- Banc of America Public and Institutional Financial Funding, LLC

- Banc of America Public Capital Corp

- Banc of America Securities Limited

- Banc of America Securitization Holding Corporation

- Banc of America Structured Notes, Inc.

- Bank of America (Hawaii) Insurance Agency, Inc.

- Bank of America Auto Receivables Securitization, LLC

- Bank of America Brasil Ltda.

- Bank of America Canada

- Bank of America Corporation (stock ticker "BAC")

- Bank of America Healthcare Limited

- Bank of America Mexico, S.A., Institucion de Banca Multiple

- Bank of America Mortgage Securities, Inc.

- Bank of America National Trust Delaware

- Bank of America Negocios e Participacoes Ltda.

- Bank of America Overseas Corporation

Case No. 13-15183-CC
Jamie Rourk v. Bank of America, N.A.

- Bank of America Reinsurance Corporation

- Bank of America Securitization Investment Trust LLC

- Bank of America Student Loan Securitization Corporation

- Bank of America Ventures

- Bank of America, N.A.

- BankAmerica International Financial Corporation

- BankAmerica International Investment Corporation

- BankAmerica Nominees (1993) Pte Ltd.

- BankAmerica Nominees (Hong Kong) Ltd.

- BankAmerica Nominees (Singapore) Pte. Ltd.

- BankAmerica Special Assets Corporation

- BBV Management Co. LLC

- BBV Switch LP

- BIRMSON, L.L.C.

- BJCC, Inc.

- Blue Finn Holdings Limited

- Bodiam Hill Limited

- BofA Global Capital Management Group, LLC

Case No. 13-15183-CC
Jamie Rourk v. Bank of America, N.A.

- Bondurant, Mixson & Elmore, LLP

- Boston Overseas Financial Corporation

- Boston World Holding Corporation

- Brash, Miranda J.

- Calnevari Holdings, Inc.

- Carringgate Limited

- Charles A. Gower, P.C.

- Charlotte Gateway Village, LLC

- Cherry Park LLC

- clearXchange, LLC

- CM REO S1 LLC

- Columbus Bay Limited

- Continental Finanziaria S P A.

- Continental Illinois Venture Corporation

- Coral Hill LLC

- Corfe Hill Limited

- Crockett Funding LLC

- CWB Community Assets, Inc.

Case No. 13-15183-CC
Jamie Rourk v. Bank of America, N.A.

- Doll is Hill Limited

- Dover Mortgage Capital 2005-A Corporation

- Dover Mortgage Capital Corporation

- Dover Two Mortgage Capital 2005-A Corporation

- Dover Two Mortgage Capital Corporation

- Dresdner Kleinwort Pfandbriefe Investments, Inc.

- Echo Canyon Park LLC

- EFP (Cayman) Funding I Limited

- EFP (Cayman) Funding II Limited

- EFP (Hong Kong) Funding I Limited

- EFP (Hong Kong) Funding II Partnership

- EFP Netherlands Investment II, V.O.F.

- EFP Netherlands Investment, B.V.

- Egan Crest Investments, LLC

- Electra Leasing LLC

- ELHV Inc.

- ELT Ltd.

- EquiCredit Corporation of America

Case No. 13-15183-CC
Jamie Rourk v. Bank of America, N.A.

- Fallon Lane LLC

- FBF Insurance Agency, Inc.

- Federal Street Shipping LLC

- FIM Funding, Inc.

- Financial Data Services, Inc.

- First Bank of Pinellas County Land Corporation

- First Capital Corporation of Boston

- Fleet Development Ventures L.L.C.

- Fleet Insurance Agency (NJ), Inc.

- Fleet Insurance Agency Corp. - Connecticut

- Fleet Insurance Agency Corp. - New York

- Fleet Insurance Agency Corporation

- Fleet Land Company

- Fleet NJ Community Development Corp.

- Fleet Pennsylvania Services Inc.

- Fleet Retail Group, LLC

- Framework, Inc.

- FRB Acceptance LLC

Case No. 13-15183-CC
Jamie Rourk v. Bank of America, N.A.

- Galway Holdings Trust

- Germantown-Seneca Joint Venture

- Gleneagles Trading LLC

- Goldbourne Park Limited

- Gower, Charles A.

- Groom Lake, LLC

- Harbour Town Funding LLC

- Harper Farm M Corp.

- Health Logic Systems Corporation

- Heathrow LLC

- Hermann, Jodie N.

- Hever Hill Limited

- High Grade Structured Credit CDO 2007-1

- Hornby Lane Limited

- Ismael I, Inc.

- JCCA, Inc.

- Jupiter Loan Funding LLC

- Kauai Hotel, L.P.

Case No. 13-15183-CC
Jamie Rourk v. Bank of America, N.A.

- KBA Mortgage, LLC

- Lake Forest Holding Company

- Laredo Park Holdings, Inc.

- LaSalle Community Development Corporation

- Leyden Bay B.V.

- Limacon Park Limited

- Loftis, Lauren Byers

- Magellan Bay Limited

- Main Place Funding, LLC

- Marlborough Sounds LLC

- McGuire Woods LLP

- Mecklenburg Park, Inc.

- Merrill Lynch Community Development Company, LLC

- Merrill Lynch New Energy Investments 2011-1, Inc.

- Merrill Lynch NMTC Corp.

- MESBIC Ventures, Inc.

- Metro Plaza, Inc.

- Midway Road Funding Ltd.

Case No. 13-15183-CC
Jamie Rourk v. Bank of America, N.A.

- Midway Trust

- ML Private Finance LLC

- MLBUSA Community Development Corp.

- MLBUSA Funding Corporation

- MNB Smartcard Technologies, Inc.

- Mortgage Equity Conversion Asset Corporation

- Muckenfuss, Robert A.

- Muirfield Trading LLC

- NB Finance Lease, Inc.

- NB Holdings Corporation

- NB Partner Corp.

- NEBACO, INC.

- Nevis Investments Limited

- Newfound Bay Limited

- Nexstar Financial Corporation

- NMS Investment Holdings, LLC

- North East Hill croft, Inc.

- One Bryant Park LLC

Case No. 13-15183-CC
Jamie Rourk v. Bank of America, N.A.

- Pacesetter SBIC Fund, Inc.

- Pacesetter/MVHC, Inc.

- Pariter Solutions, LLC

- Perissa LLC

- Phillips, Andrew G.

- Pilot Financial Corp.

- Pine Harbour S.a r.l.

- Pinehurst Trading, Inc.

- Pinyon Holdings, Inc.

- Pinyon Park LLC

- Plano Partners

- PPM Shadow Creek Funding LLC

- Pydna Corporation

- Quality Properties Asset Management Company

- Ramachandrappa, Naveen

- ReconTrust Company, National Association

- Ritchie Court M Corporation

- Riviera Funding LLC

Case No. 13-15183-CC
Jamie Rourk v. Bank of America, N.A.

- Rosedale General Partner, LLC

- Rosedale Terrace Limited Partnership

- SA Mortgage Services, LLC

- Sawgrass Trading LLC

- Second Step Asset Management Company

- Seminole Funding LLC

- Service-Wright Corporation

- Silver Peak REIT, Inc.

- Sky Financial Securitization Corp. VI

- SOPMCorp.

- Southport Investments, LLC

- Special Services Asset Management Company

- Spring Valley Management LLC

- SRF 2000, Inc.

- Standard Federal Bank Community Development Corporation

- Stanwich Loan Funding LLC

- Sterling Farms Funding, Inc.

- Sunset Hill Corporation

Case No. 13-15183-CC
Jamie Rourk v. Bank of America, N.A.

- Syndicated Properties Investments, LLC

- Taurus Finance Inc.

- Terry, Michael B.

- The Stamford Fidelity Realty Company, Inc.

- Tonopah, LLC

- TriSail Funding Corporation

- U.S. District Court Judge Clay D. Land

- U.S. Trust Company of Delaware

- UBOC Guaranteed Tax Credit Fund IX, L.L.C

- UBOC Guaranteed Tax Credit Fund VIII, L.LC

- Union Pond Investors LLC

- Union Realty and Securities Company

- Vern on Park LLC

- Washoe Asset Management Company

- Washoe Asset Management Company II

- Washoe Asset Management Company IV

- Waxhaw Park Investments, Inc.

- Wellington Land Company, Inc.

Case No. 13-15183-CC
Jamie Rourk v. Bank of America, N.A.

- Wendover Lane LLC

- West Trade, LLC

- Westhill Investments Limited

- Westquay Investments S.a r.L

- White Rock Lane LLC

- White Springs LLC

- Wickliffe A Corp.

- Zentac Productions, Inc.

## STATEMENT REGARDING ORAL ARGUMENT

Jamie Rourk requests oral argument.  This case arises out of a dispute between Rourk, an ordinary borrower, and Bank of America, Rourk's former lender and servicer.  From April 2010 through January 2012, Rourk and Bank of America disagreed about whether Bank of America had properly serviced the loan, which led to an attempted foreclosure on August 2, 2010 and an actual foreclosure on January 3, 2012.  Rourk contends that the foreclosure was wrongful, and she has asserted federal claims for violation of the Real Estate Settlement Procedures Act (RESPA) and claims under Georgia law for breach of contract, wrongful foreclosure, conversion, and intentional or negligent loan servicing.

Oral argument would assist this Court for at least three reasons.

First, the Court will likely be required to decide one or more issues of first impression, including whether a borrower can assert a state law claim for breach of contract and wrongful foreclosure where the note and deed expressly incorporate regulations issued by the Secretary of Housing and Urban Development (HUD) as conditions precedent to a lender's right of foreclosure.  While many federal district courts and state appellate courts have decided this issue – which suggests that it is a recurring issue – it appears no federal appellate court has yet issued a published opinion on this issue.  Oral argument may assist the Court in deciding an issue where there is currently no binding precedent.

Second, this case is very factually complicated.  The parties dispute what happened, the inferences that should be drawn from what happened, and the application of law to the facts.  The underlying dispute involves complex issues including the terms of mortgage instruments, the application of payments during bankruptcy, and issues regarding escrow payments and balances.  As the district court commented, "[a]fter reading the parties' summary judgment briefs, it is hard to imagine a more fact intensive dispute."  R-57 at 1.[1]  Even Bank of America admits that the loan history at issue is "difficult to understand."  R-25-1 at 36.

Third, in the district court, Bank of America argued that the issues were complicated enough to warrant oral argument.  R-51.  The same is true for this appeal; the issues are complicated enough to warrant a more thorough argument than can be accomplished by written briefs alone.

---

[1] Citations to the record are in the following format: R-[district court docket number] at [district court page number].

ii

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
     DISCLOSURE STATEMENT ................................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ................................................ i

TABLE OF CONTENTS ........................................................................ iii

TABLE OF CITATIONS ........................................................................v

STATEMENT OF JURISDICTION........................................................ ix

STATEMENT OF THE ISSUES...............................................................1

STATEMENT OF THE CASE....................................................................1

    I.     Course Of Proceedings In The District Court ......................................1

    II.    Statement of the Facts .........................................................................2

    III.   Statement of the Standard of Review.................................................11

SUMMARY OF THE ARGUMENT .......................................................11

ARGUMENT AND CITATIONS OF AUTHORITY ............................................13

    I.     Bank Of America Is Liable For Its Violations Of RESPA
         Because It Failed To Respond Properly To Rourk's Requests...........13

         A.     Bank Of America Failed To Respond Properly To
             Rourk's August 31, 2010 Qualified Written Request...............16

         B.     Bank Of America Failed To Respond Properly To
             Rourk's December 1, 2011 Qualified Written Request............19

         C.     Bank Of America Is Liable For Its Violations of RESPA
             Even Assuming Rourk's Conduct Caused Her Default............20

    II.    Bank Of America Is Liable For Breach Of Contract And
         Wrongful Foreclosure Because It Failed To Comply With HUD
         Regulations. ...........................................................................................23

A.    Failure To Comply With HUD Regulations Can Establish A Claim For Breach Of Contract And Wrongful Foreclosure.................................................................24

B.    Bank Of America Failed To Comply With HUD Regulations..................................................................28

C.    Bank Of America Is Liable For Breach Of Contract And Wrongful Foreclosure Even Assuming Rourk's Conduct Caused Her Default.................................................................36

III.    Bank Of America Is Liable For Breach Of Contract And Wrongful Foreclosure Because It Caused Rourk's Default...............39

A.    Bank Of America Was The First Party To Breach The Contract, And Its Breach Caused Rourk's Default..................39

B.    Rourk's Subsequent Inability To Tender Was Caused And Is Excused By Bank of America's Breach.......................41

IV.    Bank Of America Is Liable For Conversion Because It Misapplied Payments And Retained Proceeds From A Wrongful Foreclosure. ........................................................48

V.    This Court Should Remand This Case To The District Court For Further Proceedings. ...................................................52

CONCLUSION.........................................................................52

CERTIFICATE OF COMPLIANCE........................................................54

CERTIFICATE OF SERVICE ............................................................55

iv

# TABLE OF CITATIONS

## CASES

*Baker v. Countrywide Home Loans, Inc.*
    No. 3:08-CV-916, 2009 U.S. Dist. LEXIS 53704,
    (N.D. Tex. June 24, 2009) ............................................................27

*Bankers Life Co. v. Denton*
    458 N.E.2d 203 (Ill. App. Ct. 1983) .............................................28

*Berry v. United of Omaha*
    719 F.2d 1127 (11th Cir. 1983) .....................................................49

*Bible v. Bible*
    259 Ga. 418 (1989) .......................................................................30

\*    *Catalan v. GMAC Mortg. Corp.*
    629 F.3d 676 (7th Cir. 2011) .........................................................47

*Condel v. Bank of Am., N.A.*
    No. 12-CV-212, 2012 U.S. Dist. LEXIS 93206,
    (E.D. Va. July 5, 2012) .................................................................38

*DeFloria v. Walker*
    317 Ga. App. 578 (2012) ..............................................................31

*DeGolyer v. Green Tree Servicing, LLC*
    291 Ga. App. 444 (2008) ..............................................................23

*EEOC v. Abercrombie & Fitch Stores, Inc.*
    731 F.3d 1106 (10th Cir. 2013) .....................................................34

*Franklin v. BAC Home Loans Servicing, L.P.*
    No. 10-CV-1174, 2011 U.S. Dist. LEXIS 7510,
    (N.D. Tex. Jan. 26, 2011) .......................................................27, 38

\*    *Grebel v. Prince*
    232 Ga. App. 361 (1998) ..............................................................46

v

*Hardy v. Regions Mortg., Inc.*
    449 F.3d 1357 (11th Cir. 2006) ....................................................................13

*Johnson v. CitiMortgage, Inc.*
    351 F. Supp. 2d 1368 (N.D. Ga. 2004).......................................................48

*Kersey v. PHH Mortg. Corp.*
    682 F. Supp. 2d 588, 592-597 (E.D. Va. 2010),
    *vacated by* No. 09-CV-726, 2010 U.S. Dist. LEXIS 82802
    (E.D. Va. Aug. 13, 2010).......................................................................27, 38

*Khadija v. Fannie Mae*
    No. 12-CV-02519, 2012 U.S. Dist. LEXIS 181420,
    (N.D. Ga. Nov. 30, 2012) .....................................................................24, 39

*Lacy-McKinney v. Taylor, Bean & Whitaker Mortg. Corp.*
    937 N.E.2d 853 (Ind. Ct. App. 2010) .........................................................28

*Leatherbury v. Greenspun*
    939 A.2d 1284 (Del. 2007)..........................................................................30

*Martin v. Rollins, Inc.*
    138 Ga. App. 649 (1976) .............................................................................42

\* *Mathews v. PHH Mortg. Corp.*
    724 S.E.2d 196 (Va. 2012) ......................................................26, 27, 37, 38

*McGinnis v. Am. Home Mortg. Servicing Inc.*
    No. 11-CV-284, 2013 U.S. Dist. LEXIS 92556
    (M.D. Ga. July 2, 2013)...............................................................................47

*Md. Cas. Ins. Co. v. Welchel*
    257 Ga. 259 (1987).......................................................................................48

*Medrano v. Flagstar Bank, FSB*
    704 F.3d 661 (9th Cir. 2012) ......................................................................14

*Mortg. Assocs. v. Smith*
    No. 86-CV-1, 1986 U.S. Dist. LEXIS 16907
    (N.D. Ill. Dec. 4, 1986) ...............................................................................30

\*     *Mullins v. GMAC Morg., LLC*
      No. 09-CV-704, 2011 U.S. Dist. LEXIS 35210,
      (S.D. W. Va. Mar. 31, 2011) ...................................................................27, 38

*MXL Indus., Inc. v. Mulder*
      623 N.E.2d 369 (Ill. App. Ct. 1993) ...............................................................31

*Odem v. Pace Acad.*
      235 Ga. App. 648 (1998) .................................................................................23

*Overholt v. Wells Fargo Bank, N.A.*
      No. 4:10-CV-618, 2011 U.S. Dist. LEXIS 120044,
      (E.D. Tex. Sept. 2, 2011) .................................................................................27

*Roberts v. Cameron-Brown Co.*
      556 F.2d 356 (5th Cir. 1977) .........................................................................26

*In re Shelton*
      481 B.R. 22 (Bankr. W.D. Mo. 2012) ............................................................28

*In re Silveira*
      No. 11-44812, 2013 Bankr. LEXIS 1904, at
      (Bankr. D. Mass. May 2, 2013) ......................................................................28

*Sinclair v. Donovan*
      No. 11-CV-10, 2011 U.S. Dist. LEXIS 128220, at
      (S.D. Ohio Nov. 4, 2011).........................................................................27, 38

*Travelers Cas. & Sur. Co. v. Dormitory Auth.*
      735 F. Supp. 2d 42 (S.D.N.Y. 2010) ..............................................................31

*U.S. Bank, N.A. v. Detweiler*
      946 N.E.2d 777 (Ohio Ct. App. 2010) ...........................................................28

*United States v. Bueno-Sierra*
      99 F.3d 375 (11th Cir. 1996) ..........................................................................32

*Young v. Martin Drilling & Blasting, Inc.*
      195 Ga. App. 133 (1990) .................................................................................30

## UNITED STATES STATUTES

12 U.S.C. § 2601 ...............................................................13, 22

12 U.S.C. § 2605 ...............................................................14, 15

28 U.S.C. § 1291 .....................................................................ix

28 U.S.C. § 1331 .....................................................................ix

28 U.S.C. § 1332 .....................................................................ix

28 U.S.C. § 1367 .....................................................................ix

## GEORGIA STATUTES

O.C.G.A. § 13-4-23...................................................................42

O.C.G.A. § 23-2-114............................................................23, 31

## FEDERAL RULES OF EVIDENCE

Fed. R. Evid. 803 ....................................................................32

## FEDERAL REGULATIONS

24 C.F.R. § 203.604 ..........................................28, 30, 33, 34

24 C.F.R. § 203.606 ...................................................................28

24 C.F.R. § 3500.17 ...................................................................51

## SECONDARY SOURCES

Daniel Bahls & Katherine Hunt
    *Abhorring a Forfeiture: The Importance of Equitable Jurisdiction
    in a Foreclosure Crisis*, 41 Stetson L. Rev. 779, 806 (2012) .......................22

## STATEMENT OF JURISDICTION

This is a direct appeal from the district court's order and final judgment granting summary judgment to Bank of America on all Rourk's claims.

The district court had diversity jurisdiction to hear this case. *See* 28 U.S.C. § 1332 (a).  Rourk is a citizen of Georgia, and Bank of America is a Delaware corporation with its principal place of business in North Carolina.  The district court also had federal question jurisdiction to hear Rourk's claims under RESPA and supplemental jurisdiction to hear Rourk's claims under Georgia law. *See* 28 U.S.C. § 1331; 28 U.S.C. § 1367 (a).

This Court has jurisdiction to hear this case because Rourk has timely appealed from the district court's final judgment. *See* 28 U.S.C. § 1291.  On October 11, 2013, the district court denied Rourk's motion for partial summary judgment, granted Bank of America's motion for summary judgment, and entered a final judgment for Bank of America on all Rourk's claims.  R-57; R-58.  On November 8, 2013, Rourk filed a timely notice of appeal.  R-60.

ix

## STATEMENT OF THE ISSUES

The district court's order presents four separate issues on appeal:

(1)    Is Bank of America liable under RESPA for failing to respond properly to Rourk's qualified written requests about how to cure her default and avoid foreclosure?

(2)    Is Bank of America liable for breach of contract and wrongful foreclosure for failing to comply with HUD regulations before proceeding with foreclosure, where compliance is expressly incorporated in the contract as condition precedent to foreclosure?

(3)    Was Bank of America the first party to breach the contract and did its breach cause or excuse Rourk's subsequent inability to tender, such that Bank of America is liable for breach of contract and wrongful foreclosure?

(4)    Did Bank of America misapply Rourk's payments during her bankruptcy, and did it retain proceeds from a wrongful foreclosure, such that Bank of America is liable for conversion?

## STATEMENT OF THE CASE

### I.    Course Of Proceedings In The District Court

On February 21, 2012, Rourk filed suit against Bank of America in the United States District Court for Middle District of Georgia.  R-1.  In her complaint, Rourk asserted six counts – RESPA; breach of contract; wrongful foreclosure;

conversion; attorney fees; and punitive damages. *Id.* On February 22, 2012,

Rourk amended her complaint to add a seventh count for intentional or negligent

loan servicing. R-3.

On March 26, 2012, Bank of America moved to dismiss Rourk's complaint

for failure to state a claim. R-6. On August 28, 2012, the district court largely

denied Bank of America's motion. R-19 at 1. The parties proceeded through

discovery, including filing motions to compel on limited issues, which were

granted by the district court by a summary text-entry order. R-28; R-36.

Near the end of discovery, both parties moved for summary judgment. On

May 23, 2013, Rourk moved for partial summary judgment on Bank of America's

liability, with damages to be submitted to a jury. R-34. On June 28, 2013, Bank of

America moved for summary judgment on all Rourk's claims. R-41. On

September 19, 2013, the district court held a hearing on the motions for summary

judgment. R-53.

On October 11, 2013, the district court issued an order denying Rourk's

motion and granting Bank of America's motion. R-57. On the same day, the

district court entered final judgment for Bank of America. R-58. On November 8,

2013, Rourk filed a timely notice of appeal. R-60.

## II.    Statement of the Facts

On March 16, 2000, Jamie Rourk bought a house in Columbus, Georgia. R-

2

34-3 ¶ 2.  She signed a note with New South Federal Savings Bank, agreeing to pay the principal of $44,413.00 plus interest at 8.875%, with monthly payments beginning on May 1, 2000.  R-25-4 at 3.  Beginning in at least 2004 and through the end of September 2010, Rourk's required monthly payments were $394.83.

Rourk granted New South a security deed, which provided that New South would have the right to accelerate and proceed with foreclosure subject to certain conditions.  R-25-4 at 9.  One such condition was that New South would have to first comply with HUD regulations before accelerating and foreclosing.  R-25-4 at 4; R-25-4 at 9.  The Deed also provided Rourk with a right of reinstatement, which applies even after "failure to pay an amount due under the Note" and "even after foreclosure proceedings are instituted."  R-25-4 at 9.

On April 17, 2000, New South assigned Rourk's mortgage to Countrywide Home Loans, Inc..  R-41-2 ¶ 8.  Countrywide changed its name to BAC Home Loans Servicing, L.P., which later merged into Bank of America, N.A.  *Id.* ¶ 9.

Within a few years, Rourk began having trouble with her finances, and on June 25, 2004, she filed for Chapter 13 bankruptcy.  R-41-2 ¶ 12.  Although Rourk was in arrears with Bank of America when she entered bankruptcy, through her trustee Rourk paid off her pre-petition arrears and also made her required monthly payments of $394.83 moving forward.  R-25-2 at 4-10.  Bank of America did not reject any of these payments; it never informed her that she was in default; and it

3

never notified her of any change to her required monthly payment.  R-34-3 ¶¶ 8-9.

By February 2010, Rourk was nearing the end of her bankruptcy.  On February 26, 2010, Rourk's bankruptcy trustee wrote a letter to Rourk and Bank of America.  R-25-2 at 4-10.  The letter describes each payment made on Rourk's behalf, and the trustee asked Bank of America to confirm that the payment history matched Bank of America's.  *Id.* at 4.  The trustee also informed Rourk and Bank of America that the trustee would disburse the March 2010 payment of $394.83, and beginning on April 1, 2010, Rourk would be responsible for sending payments directly to Bank of America.  *Id.*

Rourk began making payments soon after.  She made her first payment of $394.83 for April 2010 by electronic funds transfer, which Bank of America accepted on April 27, 2010.  R-34-3 ¶¶ 12-13.  Rourk made another payment of $394.83 for May 2010 by electronic funds transfer, which Bank of America accepted on May 19, 2010.  *Id.* ¶ 15.

But Rourk quickly ran into problems with Bank of America.  On May 21, 2010, Bank of America returned Rourk's May 2010 payment.  *Id.* ¶ 16.  On June 1, 2010, Bank of America informed Rourk that she was in default because Bank of America had not received monthly payments since September 2009.  *Id.* ¶ 19; R-25-2 at 1-2.  On June 9, 2010, Bank of America also returned Rourk's April 2010 payment.  R-34-3 ¶ 18.  Rourk attempted to make her June 2010 payment, but

4

Bank of America also rejected this payment. *Id.* ¶ 17. Rourk later learned that Bank of America rejected her payments because it has a policy of requiring certified funds when an account is in default. R-25-1 at 26-29.

At the time, though, Rourk did not understand what was happening, and so on June 10, 2010, she faxed a letter to Bank of America explaining that Bank of America had made an error. R-25-2 at 3-15. She enclosed a copy of the trustee's letter and payment record as proof that she had, in fact, made payments throughout her bankruptcy. *Id.*

That did not fix the problem though. On June 16, 2010, Rourk received a letter from Bank of America's lawyers at McCalla Raymer, which stated that her loan was in foreclosure and she owed $42,882.49. R-25-2 at 16. On June 18, 2010, Rourk received another letter from McCalla Raymer, which was titled "Notice of Foreclosure Sale." R-25-2 at 19. The letter stated that Rourk owed the entire outstanding principal and interest and any authorized charges, and Bank of America had scheduled a foreclosure sale for August 2, 2010. *Id.* at 19-20.

After placing Rourk into foreclosure, Bank of America began sending notices regarding reinstatement. On June 22, 2010, Bank of America sent Rourk a "Reinstatement Calculation," which stated that her loan was in "foreclosure" and she needed to pay **$2,535.76** to reinstate her loan. R-25-2 at 25-27. The notice said that Rourk was in default for payments of $4,343.13 on eleven monthly

5

payments at $394.83 per month; she had an escrow deficiency of $770.03; she owed property inspection fees of $113.85; she owed $1,110.00 in foreclosure fees and expenses; she owed a cancellation fee of $4.35; and she had various credits and partial payments that brought the total amount owed down to $2,535.76. *Id.* There was no explanation of the credits and partial payments.

Faced with the prospect of a pending foreclosure, Rourk hired Charles A. Gower, P.C. to represent her. On July 14, 2010, Charlie Gower sent a letter to McCalla Raymer informing them that Rourk was not behind on her payments and enclosing yet another copy of the trustee's letter and payment record. R-25-2 at 28-31. Gower noted that Bank of America had returned Rourk's April and May 2010 payments and would not accept her attempts to make June and July 2010 payments. *Id.* at 28. Gower, therefore, offered that "Jamie is prepared to send you a cashier's check for the April through July payments." *Id.* at 29.

It is unclear whether anyone at Bank of America during this time was trying to fix the errors with Rourk's account, but on July 26, 2010, Bank of America sent Rourk a history of payments on her account. R-25-2 at 32-47. The account starts in January 2005 and shows the last payment as posting in April 2009. *Id.* It does not show any payments for April 2009 through March 2010, even though the trustee had confirmed to Bank of America that it had made such payments. *Id.*

During this time, Rourk also made many phone calls to Bank of America

6

and McCalla Raymer trying to get someone to fix her account. R-34-3 ¶ 37. She asked that Bank of America tell her how much she needed to pay to make her account current, but no one would give her a definitive response; some gave conflicting responses, some did not respond, and others told her that she could not stop the foreclosure. *Id.* ¶¶ 37-40.

Bank of America had scheduled Rourk's house to be sold at foreclosure on August 2, 2010, but it was cancelled on the day of the scheduled sale without prior notice to Rourk. *Id.* ¶¶ 41-42.

Although the foreclosure was cancelled, Rourk's account was not corrected and her problems with Bank of America continued. On August 11, 2010, Bank of America sent Rourk a notice of intent to accelerate, which provided her with a *second* reinstatement amount. Bank of America told Rourk that she needed to pay **$989.73** to reinstate her loan. R-25-2 at 48-49. The notice said that Rourk owed monthly charges of $4,737.96 based on monthly charges dating back to September 1, 2009; she owed late charges of $47.37; and she had various credits and partial payments that brought the total owed down to $989.73. *Id.* Bank of America did not explain the credit and partial payments or why they were different from the June 22 notice. It also did not explain why the amount owed was so much lower than the June 22 notice.

Yet, also on August 11, 2010, McCalla Raymer sent Gower a letter, in which

McCalla Raymer informed Gower that, "[p]er our client, on August 16, 2010 the above referenced loan will be reflected as current through April 1, 2010."  R-25-2 at 50.  The letter then instructed that, "[o]n or after August 16, 2010, please contact Paul Webb with BAC directly at (805) 955-5554 or Paul.Webb@bankofamerica.com to make arrangements to bring the referenced loan current for payments due April through August, 2010."  *Id.*

Rourk had hoped that this letter would resolve her account, but then on August 12, 2010, Bank of America sent Rourk yet another notice of intent to accelerate, which provided Rourk with a *third* reinstatement amount.  R-25-2 at 52-53.  Bank of America told Rourk that she needed to pay **$1,370.73** to reinstate her loan.  *Id.*  The notice said Rourk owed monthly charges of $1,579.32 based on monthly charges dating back to May 1, 2010; she owed late charges of $47.37; and she had a partial payment that brought the total down to $1,370.73.  *Id.*  Bank of America did not explain the partial payment or why it was different from the June 22 and August 11 notices.  It did not explain why Rourk had late charges.  And it did not explain why the amount owed was more than the August 11 notice, even though it was based on fewer monthly charges.

By this point, Rourk was thoroughly confused. She did not know how much she needed to pay to cure her default and avoid foreclosure, and she did not understand how Bank of America was calculating the different and conflicting

8

amounts that it said she owed.  R-34-3 ¶¶ 26-60.  But she was told that her account would be updated on August 16, 2010, and that on or after that date, she should contact Webb.

So, Rourk contacted Webb.  On August 31, 2010, she sent him a letter explaining why she believed Bank of America made errors in her account and describing what information she needed from Bank of America.  R-25-2 at 55-56.

She explained that she received two letters dated August 11, 2010.  The first was from Bank of America's lawyers at McCalla Raymer, and as instructed by that letter, Rourk was contacting Webb to find out how to make her loan current.  She asked specifically "[w]hat is the amount needed to bring our loan current through the end of August, 2010?"  *Id.* at 55.

She then explained that the second letter was from Bank of America itself, and it said she owed unspecified costs, late charges, and other fees.  Rourk did not understand these costs, late charges, and fees – especially in light of McCalla Raymer's letter – and so she asked Webb to explain "[w]hat are these costs of $989.73 and why do you say we owe them?"  *Id.*

Finally, Rourk explains that McCalla Raymer had provided her with an incomplete payment history, and she asked Webb to explain many of the entries and provide her with a complete account statement.  *Id*.  Rourk did not receive a response from Webb.

9

For the next year and a half, Rourk began putting money aside, so that when Bank of America provided her with amount needed to make her loan current, she would be able to do so.  R-34-3 ¶¶ 79, 95.  She did not make any payments to Bank of America during this time, though, because she was understandably confused by conflicting reinstatement amounts, and she wanted some explanation from Bank of America before agreeing to make any payments – especially because each notice she received also contained various improper charges.  *See* R-34-3 ¶¶ 44-60.

But Bank of America never provided her with a reinstatement amount, and she could not reasonably determine on her own the amount needed to make her loan current.  Instead, Bank of America again proceeded with foreclosure.  On October 9, 2010, Bank of America updated its system to reflect that Rourk was again in foreclosure.  R-25-1 at 139-140.

Yet, Bank of America did not communicate any of this to Rourk.  In fact, Rourk did not hear from Bank of America for another year.  On November 18, 2011, McCalla Raymer sent Rourk another notice of foreclosure sale, scheduling the foreclosure for January 3, 2012.  R-25-2 at 61-66.

Rourk once again tried to contact Webb to find out how to cure her default and avoid foreclosure.  On December 1, 2011, she sent Webb a letter, explaining why she believed Bank of America has made certain errors in her account and describing what information she needs from Bank of America.  R-25-2 at 67-84.

10

Rourk enclosed her letter from "August 31, 2010 to which we never received a reply." *Id.*  She said that "[w]e need answers to those questions." *Id.*  She also enclosed a copy of "a reinstatement calculation Bank of America sent us as of July 2, 2010 with all sorts of fees listed." *Id.*  She asked Webb to "[p]lease explain what everything means on this letter.  It makes no sense to us." *Id.*  Lastly, she asked Webb to explain "exactly how much I owe to bring this loan current and how you calculate it." *Id.* at 68.  Rourk did not receive a response from Webb.

After over a year and half of providing Rourk with conflicting notices and failing to answer her questions, Bank of America foreclosed.  On January 3, 2012, it sold Rourk's house through a non-judicial foreclosure.

Rourk wrote one final letter to Bank of America on February 17, 2012, asking for an explanation for why it foreclosed and why it never responded to her letters.  R-1-13.  On February 21, 2012, Rourk filed this action against Bank of America seeking to recover for the injuries she suffered as a result of Bank of America's wrongful conduct.  Months after Rourk filed this suit, on May 8, 2012, Bank of America's lawyers at McGuire Woods finally responded to Rourk's written letters, but at this point the response was much too late.  R-25-3 at 1-5.

## III.    Statement of the Standard of Review

In an appeal from summary judgment, the standard of review is *de novo*.

## SUMMARY OF THE ARGUMENT

11

In granting summary judgment for Bank of America, the district court relied solely on one finding. The district court held that:

> Although [Bank of America] may have made mistakes servicing Plaintiff's mortgage account and may not have effectively communicated with Plaintiff, neither the mistakes nor the failure of communication caused Plaintiff's account to go into default. Plaintiff's failure to make any payment on her mortgage for almost two years caused her default and the corresponding foreclosure on her home. This undisputed fact is fatal for all of Plaintiff's claims.

R-57 at 1.

There are two serious problems with the district court's holding, both of which require this Court to reverse the district court's order of summary judgment.

First, the district court failed to distinguish between Rourk's *default* and Bank of America's *foreclosure*. Rourk has asserted claims for violations of RESPA and breach of contract and wrongful foreclosure claims for failure to comply with HUD regulations. These claims are separate from and do not depend on whether Rourk's conduct caused her default. And so, even assuming that Rourk's conduct caused her default, Bank of America is still liable. Even after Rourk was in default, Bank of America still had a statutory duty to respond properly to RESPA requests and still had a contractual duty to comply with HUD regulations before proceeding with foreclosure. In fact, both RESPA and the contract provisions requiring compliance with HUD regulations expressly contemplate that they govern a lender's duties *after* a default.

12

Second, the district court was also wrong to conclude that Rourk's conduct caused her default. For Rourk's claims that do depend on whether she caused her default, the district court improperly ignored how Bank of America was the first party to breach the contract, and how its breach and misconduct caused and excused Rourk's subsequent inability to tender. The district court overlooked evidence that Rourk could not reasonably determine on her own the amount needed to cure the default that Bank of America caused and that she was ready, willing and able to reinstate her loan only if Bank of America would provide her with that amount. It was Bank of America's breach and misconduct that prevented her from doing that and thus caused her foreclosure.

For those reasons, this Court should reverse the district court's granting summary judgment to Bank of America.

## ARGUMENT AND CITATIONS OF AUTHORITY

### I.    Bank Of America Is Liable For Its Violations Of RESPA Because It Failed To Respond Properly To Rourk's Requests.

RESPA is a consumer protection statute that regulates the real estate settlement process and loan servicing practices. *Hardy v. Regions Mortg., Inc.*, 449 F.3d 1357, 1359 (11th Cir. 2006). Congress enacted REPSA to "insure that consumers throughout the Nation are provided with greater and more timely information" and to protect them from "certain abusive practices that have developed." 12 U.S.C. § 2601 (a). As such, courts must liberally construe

13

RESPA's language to serve its remedial purpose.  *See, e.g.*, *Medrano v. Flagstar Bank, FSB*, 704 F.3d 661, 665-66 (9th Cir. 2012).

Among other things, RESPA authorizes a borrower to make qualified written requests to his or her loan servicer for servicing information, and if the servicer does not respond appropriately, the borrower may bring a private cause of action for any actual damages.  12 U.S.C. § 2605.

A servicer must first acknowledge receipt of a qualified written request within twenty days.  12 U.S.C. § 2605 (e)(1)(A).

A qualified written request is "a written correspondence" that is not "on a payment coupon or other payment medium supplied by the servicer" and that:

> (i) includes, or otherwise enables the servicer to identify, the name and account of the borrower; and
> (ii) includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower.

12 U.S.C. § 2605 (e)(1)(B).

The servicer must also respond to a qualified written request within sixty days and "before taking any action with respect to the inquiry of the borrower."  12 U.S.C. § 2605 (e)(2).

The servicer must respond in one of three ways.  First, the servicer may:

> make appropriate corrections in the account of the borrower, including the crediting of any late charges or penalties, and transmit to the borrower a written notification of such correction (which shall include

14

the name and telephone number of a representative of the servicer
who can provide assistance to the borrower)[.]

12 U.S.C. § 2605 (e)(2)(A).  Second, the servicer may:

> after conducting an investigation, provide the borrower with a written
> explanation or clarification that includes--
>> (i) to the extent applicable, a statement of the reasons for which
>> the servicer believes the account of the borrower is correct as
>> determined by the servicer; and
>> (ii) the name and telephone number of an individual employed
>> by, or the office or department of, the servicer who can provide
>> assistance to the borrower[.]

12 U.S.C. § 2605 (e)(2)(B).  Or third, the servicer may:

> after conducting an investigation, provide the borrower with a written
> explanation or clarification that includes--
>> (i) information requested by the borrower or an explanation of
>> why the information requested is unavailable or cannot be
>> obtained by the servicer; and
>> (ii) the name and telephone number of an individual employed
>> by, or the office or department of, the servicer who can provide
>> assistance to the borrower[.]

12 U.S.C. § 2605 (e)(2)(C).

A servicer who "fails to comply with any provision of this section shall be

liable to the borrower for each such failure in . . . an amount equal to . . . any actual

damages to the borrower as a result of the failure."  12 U.S.C. § 2605 (f).  The

borrower may also recover "the costs of the action, together with any attorneys

fees incurred in connection with such action as the court may determine to be

reasonable under the circumstances."  12 U.S.C. § 2605 (f)(3).

Rourk made two qualified written requests to Bank of America – one on

15

August 31, 2010 and the other on December 1, 2011. Either request is sufficient to show that Bank of America is liable to Rourk for its violations of RESPA.

###    A.    Bank Of America Failed To Respond Properly To Rourk's August 31, 2010 Qualified Written Request.

Rourk has put forth evidence establishing Bank of America's liability for failing to respond properly to her August 31, 2010 qualified written request.

First, Rourk's August 31, 2010 letter to Webb of Bank of America is a qualified written request. R-25-2 at 55-56. The letter is a separate written correspondence, and it is not on a payment coupon or other payment medium. *Id.* The letter includes Rourk's name and account number. *Id.* at 55. In her letter, Rourk says why she believes Bank of America has made errors in her account and describes what information she needs from Bank of America. *Id.* at 56.

Second, Bank of America did not respond properly to Rourk's August 31, 2010 request. Although the Post Office confirms delivery on September 7, 2010, Bank of America did not acknowledge receipt within twenty days. R-25-2 at 57; R-41-24 at 21. Bank of America also did not respond within sixty days and before taking action related to Rourk's request. R-34-3 ¶¶ 64-65; R-41-7 at 40; R-41-24 at 76 ("Q. Would you ever write a *written* response to the borrower? A. No. Q. Why not? A. That's not our process. . . .") (emphasis added).

Third, Bank of America's failure to respond properly to Rourk's August 31, 2010 request caused Rourk's damages. To cure her default and avoid foreclosure,

16

Rourk needed to know how much to pay Bank of America.  Yet, because Bank of America had given her three different amounts by August 12, 2010 – each based on conflicting calculations and all including improper fees – and would not answer her questions about reinstatement, Rourk could not reasonably determine on her own the amount needed to cure her default and avoid foreclosure.

Bank of America's lawyers told Rourk that her account would be corrected on August 16, 2010 and that she would need to contact Webb directly on or after August 16, 2010 to bring her account current.  R-25-2 at 50.  And so that is what Rourk did.  Relying on her statutory right to make a qualified written request to her servicer, on August 31, 2010, Rourk wrote a letter addressed directly to Webb.  *See* R-41-24 at 21("Q. Would you agree that it's a reasonable way for Jamie to contact you is to write you a letter as she did . . . and send it certified mail?  A. I would agree.").

Rourk asked expressly and specifically "[w]hat is the amount needed to bring our loan current through the end of August, 2010?"  R-25-2 at 55.  Had Bank of America timely answered her questions, Rourk would have been able to cure her default.  But Bank of America did not properly acknowledge receipt of Rourk's letter and did not properly respond.  As a result, Rourk was unable to cure her default and Bank of America foreclosed on her home.

Bank of America eventually responded to Rourk's August 31, 2010 request.

17

On May 8, 2012, McGuire Woods wrote that, "[a]s of August 31, 2010, the Loan was delinquent $1,842.33 in principal, interest, and escrow payments, plus $15.79 in late charges."  R-25-3 at 4.  They explained that "the Loan was delinquent in the amount of four contractual monthly payments (May, June, July, and August 2010) plus late fees for three late monthly payments (May, June, and July 2010)."  *Id.*

But this response was obviously too late.  It was well past the twenty day deadline for acknowledge of receipt and the sixty day and before-any-action-is-taken deadline for response.  And most importantly, it was too late for Rourk to avoid foreclosure, which Bank of America completed on January 3, 2012.

The response also further demonstrates that Rourk could not reasonably determine on her own the amount she needed to pay to cure her default and avoid foreclosure.   If the May 8, 2012 response is accurate, then as of August 31, 2010, Rourk needed to pay **$1,858.12** to reinstate her loan – not the $1,370.73 in the August 12 notice, the $989.73 in the August 11 notice, or the $2,535.76 in the June 22 notice.  R-25-2 at 25-27; R-25-2 at 48-49; R-25-2 at 52-53.  In other words, even if Rourk had paid the August 12 notice in full, including the improper late charges, Bank of America still would have considered her in default and could have proceeded with foreclosure.

Rourk also could not simply add up her monthly payments of $394.83 and expect that amount to be sufficient, even assuming she could figure out how many

months Bank of America considered her to be behind. The $1,842.33 in principal, interest, and escrow payments owed as of August 30 is $263.01 *more than* the four monthly payments Bank of America says Rourk owed. Nor could Rourk reasonably determine on her own the $15.79 in late fees Bank of America says she owed because those fees also had somehow changed from the August 12 notice.

In sum, because Bank of America did not properly acknowledge receipt of and respond to Rourk's August 30, 2010 qualified written request, Rourk was unable to cure her default and Bank of America foreclosed on her home. R-34-3 ¶ 94 ("Despite my numerous calls and letters to BANA and its attorneys in 2010 and 2011, I never received a verified, full amount due to reinstate my Loan prior to foreclosure."); *id.* ¶ 95 ("During the entire period from April, 2010 through January, 2012, I was ready, willing, and able to pay whatever amounts were due to reinstate my Loan if only BANA would verify the full amount due."); *see also id.* ¶¶ 22-93 (explaining the steps Rourk took to determine reinstatement amount).

### B. Bank Of America Failed To Respond Properly To Rourk's December 1, 2011 Qualified Written Request.

As to the December 1, 2011 letter, Rourk has also put forth evidence establishing Bank of America's liability.

First, Rourk's December 1, 2011 letter to Webb of Bank of America is a qualified written request. R-25-2 at 67-84. The letter is a separate written correspondence, and it is not on a payment coupon or other payment medium. *Id.*

19

The letter includes Rourk's name and her account number.  *Id.* at 67.  In her letter, Rourk says why she believes Bank of America has made certain errors in her account and describes what information she needs from Bank of America.  *Id.*

Second, Bank of America did not respond properly to Rourk's December 1, 2011 request.  Although the Post Office confirms delivery on or around December 9, 2011, Bank of America did not acknowledge receipt within twenty days.  R-25-2 at 69; R-41-24 at 21.  Bank of America also did not respond within sixty days and before taking action related to Rourk's request.  R-34-3 ¶¶ 77-78; R-41-7 at 41; R-41-24 at 21.

Third, Bank of America's failure to respond properly to Rourk's December 1, 2011 request caused Rourk's damages.  Just as she did when she sent her August 31, 2010 request, Rourk needed to know how much to pay Bank of America to cure her default and avoid foreclosure.  Because Bank of America had given her three different amounts – each based on conflicting calculations and all including improper late fees – and would not answer her questions about reinstatement, Rourk could not reasonably determine on her own the amount needed to cure her default and avoid foreclosure.  R-34-3 ¶¶ 94-95; *see also id.* ¶¶ 22-93.

### C.    Bank Of America Is Liable For Its Violations of RESPA Even Assuming Rourk's Conduct Caused Her Default.

The district court did not hold that Rourk's August 31, 2010 and December 1, 2011 letters were not qualified written requests.  It also did not hold that Bank of

20

America responded properly to Rourk's requests.  Instead, the district court's sole basis for summary judgment is causation.  The district court held that "Plaintiff's own conduct led to her *default and the foreclosure*."  R-57 at 8 (emphasis added).

As will be explained in section three of this Argument, the district court is wrong – Bank of America's conduct caused Rourk's default, not her own.  But that does not matter for Rourk's RESPA claims.  These claims are separate from and do not depend on whether Rourk's conduct caused her default.  And so, even assuming that Rourk's conduct caused her default, Bank of America is still liable for its violations of RESPA.  Even after Rourk was in default, Bank of America still had a statutory duty to respond properly to Rourk's requests, and it was Bank of America's failure to do so that turned Rourk's default into *foreclosure*.

In other words, the district court failed to distinguish between Rourk's *default* and Bank of America's *foreclosure*.  Once she was in default, Rourk needed to know how much to pay Bank of America to cure her default and avoid foreclosure.  Indeed, the Deed expressly provides that Rourk's right of "reinstatement" applies even after "failure to pay an amount due under the Note" and "even after foreclosure proceedings are instituted."  R-25-4 at 9.

But Rourk could not reasonably determine on her own the amount she needed to pay.  That is why she asked Bank of America for that information.  And so even assuming that Rourk's conduct caused her default, the *foreclosure* would

have been prevented if Bank of America had responded properly to Rourk's requests. If Bank of America had complied with RESPA and provided Rourk with the information she requested, Rourk could and would have cured her default and avoided foreclosure. R-34-3 ¶¶ 94-95; *see also id.* ¶¶ 22-93.

RESPA expressly requires a servicer to promptly acknowledge receipt from and timely respond to qualified written requests from a borrower. This duty exists even if the borrower's conduct caused the default at issue. In fact, one reason for RESPA is precisely so that, if a borrower is in default, the borrower can receive "timely information" he or she needs to understand the default, protect his or her rights, and fix the problem. 12 U.S.C. § 2601 (a); *see also* Daniel Bahls & Katherine Hunt, *Abhorring a Forfeiture: The Importance of Equitable Jurisdiction in a Foreclosure Crisis*, 41 Stetson L. Rev. 779, 806 (2012) ("One of the largest complaints of homeowners who are sued in foreclosure is that when they began having trouble making payments, they were unable to have any meaningful communication with their lender regarding their circumstances or options.").

The district court effectively created a *judicial* exception to RESPA. It held that, if a borrower's conduct caused the default, the servicer has no duty to respond to any request about how to cure the default and the lender can proceed without informing the borrower of how to avoid foreclosure. But Congress chose not to condition RESPA's duties on whether a borrower caused the default, and this

22

Court should not allow the district court to create an exception to achieve the same effect.  It would impose a severe penalty on borrowers while giving servicers enormous power to proceed with the drastic remedy of foreclosure.  Any default by a borrower would allow a servicer to ignore a request for how to cure the default, which is exactly what Bank of America did to Rourk in this case.  Rourk tried to cure her default and avoid foreclosure, but she was prevented from doing so by Bank of America's misconduct.

For those reasons, this Court should reverse the district court's order granting summary judgment to Bank of America on Rourk's RESPA claims.

## II.    Bank Of America Is Liable For Breach Of Contract And Wrongful Foreclosure Because It Failed To Comply With HUD Regulations.

Georgia law provides for a breach of contract claim.  "[T]he elements for a breach of contract claim in Georgia are merely 'the breach and the resultant damages to the party who has the right to complain about the contract being broken.'"  *Odem v. Pace Acad.*, 235 Ga. App. 648, 654 (1998).

Georgia law also provides for the tort of wrongful foreclosure.  "Powers of sale in deeds of trust, mortgages, and other instruments shall be *strictly construed* and shall be *fairly* exercised."  O.C.G.A. § 23-2-114 (emphasis added).  "Where [the lender] does not comply with the statutory duty under [Code Section] 23-2-114 to exercise fairly the power of sale in a deed to secure debt, the [borrower] may sue for damages for the tort of wrongful foreclosure."  *DeGolyer v. Green*

23

*Tree Servicing, LLC*, 291 Ga. App. 444, 448 (2008).

A lender that breaches the contract provisions regarding foreclosure may, therefore, be liable for both breach of contract and wrongful foreclosure. A "foreclosing party has the duty to exercise fairly the power of sale in a deed to secure debt," and "there is a breach of [this] duty if the foreclosing party violates the provisions of the loan agreements." *Khadija v. Fannie Mae*, No. 12-CV-2519, 2012 U.S. Dist. LEXIS 181420, at *19 (N.D. Ga. Nov. 30, 2012).

Rourk has two bases for her breach of contract and wrongful foreclosure claims – one is based on Bank of America's failure to comply with HUD regulations, and the other is based on the fact that Bank of America caused Rourk's default. In this section of the Argument, Rourk will show why Bank of America is liable because it failed to comply with HUD regulations, which is separate from and does not depend on whether Bank of America caused Rourk's default.

### A. Failure To Comply With HUD Regulations Can Establish A Claim For Breach Of Contract And Wrongful Foreclosure.

The contract between Rourk and Bank of America consists of a promissory note and a security deed. R-25-4 at 3-5; R-25-4 at 6-13. If certain conditions are met, the contract gives Bank of America the right to accelerate Rourk's debt and to proceed with a non-judicial foreclosure. One condition, obviously, is a failure by Rourk to make a monthly payment or to perform other contract obligations for a period of at least thirty days. But that is not the only condition precedent.

24

Another condition to Bank of America's right to accelerate and foreclose is that Bank of America must first comply with HUD regulations.  The Note provides that:

> **(B) Default**
> If Borrower defaults by failing to pay in full any monthly payment, then Lender may, *except as limited by regulations of the Secretary* in the case of payment defaults, require immediate payment in full of the principal balance remaining due and all accrued interest. Lender may choose not to exercise this option without waiving its rights in the event of any subsequent default.  In many circumstances *regulations issued by the Secretary will limit Lender's rights* to require immediate payment in full in the case of payment defaults. *This Note does not authorize acceleration when not permitted by HUD regulations*.  As used in this Note, 'Secretary' means the Secretary of Housing and Urban Development or his or her designee.

R-25-4 at 4 (emphasis added).  Likewise, the Deed provides that:

> **(a) Default**.  Lender may, *except as limited by regulations issued by the Secretary* in the case of payment defaults, require immediate payment in full of all sums secured by this Security instrument if:
> (i) Borrower defaults by failing to pay in full any monthly payment required by this Security Instrument prior to or on the due date of the next monthly payment, or
> (ii) Borrower defaults by failing, for a period of thirty days, to perform any other obligations contained in this Security Instrument.
>
> . . .
>
> **(d) Regulations of HUD Secretary**.  In many circumstances *regulations issued by the Secretary will limit Lender's rights*, in the case of payment defaults, to require immediate payment in full and foreclose if not paid. *This Security Instrument does not authorize acceleration or foreclosure if not permitted by regulations of the Secretary*.

25

R-25-4 at 9 (emphasis added).

Because the contract expressly conditions Bank of America's right to accelerate and foreclose on compliance with HUD regulations, Rourk has state law claims for breach of contract and wrongful foreclosure for Bank of America's failure to comply with HUD regulations. This is true, even though HUD regulations do not establish an implied private cause of action. *See Roberts v. Cameron-Brown Co.*, 556 F.2d 356, 361 (5th Cir. 1977). In other words, Bank of America is liable under *state law* for breaking its contractual promise to comply with HUD regulations before obtaining and exercising the right to accelerate and foreclose; it is not liable under federal law for violating HUD regulations.

Although neither this Court nor any Georgia court has addressed this question before, many other courts have. They have held that, where the contract expressly incorporates compliance with HUD regulations as a condition on the right to accelerate and foreclose, the borrower may assert state law claims based on the lender's failure to comply with HUD regulations.

For example, in *Mathews*, the Virginia Supreme Court looked at language identical to the language in this case and held that:

> These words 'are clear and unambiguous' and we will construe them according to their plain meaning. They express the intent of the parties that the rights of acceleration of foreclosure do not accrue under the Deed of Trust unless permitted by HUD's regulations. We cannot conceive of any other purpose for which they would have been included. Therefore, the Deed of Trust expressly withholds

26

authorization to accelerate or foreclose if the Regulation does not
permit [the lender] to do so.  Any other interpretation would render
these provisions meaningless.

*Mathews v. PHH Mortg. Corp.*, 724 S.E.2d 196, 201 (Va. 2012) (citations

omitted).

Similarly, in *Mullins*, a West Virginia district court explained that:

Quite simply, plaintiffs are suing under a straightforward state law
contract theory, alleging that defendants did not uphold their end of
the contractual bargain.  Plaintiffs are not, as defendants would have
the court believe, suing to enforce HUD regulations under some vague
and likely non-existent cause of action allowing a member of the
public to take upon himself the role of regulatory enforcer.  These two
theories of recovery are distinct and unrelated.

*Mullins v. GMAC Morg., LLC*, No. 09-CV-704, 2011 U.S. Dist. LEXIS 35210, at

*8 (S.D. W. Va. Mar. 31, 2011).

Other courts have expressly agreed with or adopted the same reasoning used

in *Mathews* and *Mullins*.  *See Kersey v. PHH Mortg. Corp.*, 682 F. Supp. 2d 588,

592-597 (E.D. Va. 2010), *vacated by* No. 09-CV-726, 2010 U.S. Dist. LEXIS

82802 (E.D. Va. Aug. 13, 2010) (based on lack of subject matter jurisdiction);

*Franklin v. BAC Home Loans Servicing, L.P.*, No. 10-CV-1174, 2011 U.S. Dist.

LEXIS 7510, *6-7 (N.D. Tex. Jan. 26, 2011); *Sinclair v. Donovan*, No. 11-CV-10,

2011 U.S. Dist. LEXIS 128220, at *23-*32 (S.D. Ohio Nov. 4, 2011); *Overholt v.

Wells Fargo Bank, N.A.*, No. 4:10-CV-618, 2011 U.S. Dist. LEXIS 120044, at *9-

*17 (E.D. Tex. Sept. 2, 2011); *Baker v. Countrywide Home Loans, Inc.*, No. 3:08-

CV-916, 2009 U.S. Dist. LEXIS 53704, at *14-*18 (N.D. Tex. June 24, 2009); *In re Shelton*, 481 B.R. 22, 30 (Bankr. W.D. Mo. 2012); *In re Silveira*, No. 11-44812, 2013 Bankr. LEXIS 1904, at *43-*48 (Bankr. D. Mass. May 2, 2013); *U.S. Bank, N.A. v. Detweiler*, 946 N.E.2d 777, 783 (Ohio Ct. App. 2010); *Lacy-McKinney v. Taylor, Bean & Whitaker Mortg. Corp.*, 937 N.E.2d 853, 864 (Ind. Ct. App. 2010); *Bankers Life Co. v. Denton*, 458 N.E.2d 203, 206 (Ill. App. Ct. 1983).

### B.    Bank Of America Failed To Comply With HUD Regulations.

HUD requires a lender to contact a borrower before proceeding with foreclosure, and its regulations explain specifically how the lender should contact the borrower.  *See* 24 C.F.R. § 203.604; 24 C.F.R. § 203.606.

The lender must either have "a face-to-face interview" with the borrower or make a "reasonable effort to arrange such a meeting."  24 C.F.R. § 203.604 (b). The interview or a reasonable effort to arrange such a meeting must also take place "before three full monthly installments due on the mortgage are unpaid."  *Id.*

Bank of America agrees that it did not have a face-to-face interview with Rourk, and so the only issue is whether Bank of America made a timely and reasonable effort to arrange such a meeting.

A reasonable effort to arrange a face-to-face interview requires at least two steps.  The lender must send "a minimum of one letter sent to the mortgagor certified by the Postal Service as having been dispatched."  24 C.F.R. § 203.604

28

(d).  And the lender must make "at least one trip to see the mortgagor at the mortgaged property."  *Id.*  These are the minimal steps required; based on the facts of the case, more may be required to constitute a reasonable effort.

Rourk has put forth evidence establishing that, for at least *five* independent reasons, Bank of America did not make a timely and reasonable effort to arrange a face-to-face interview.

First, Rourk was not sent a letter seeking to arrange a face-to-face *interview*. The only letter Bank of America contends complies with this requirement, and the one that the district court held was sufficient, is a September 14, 2011 letter addressed from "Titanium Solutions."  R-25-4 at 18.

The district court, however, overlooked that this letter says only that Titanium Solutions will come to Rourk's house to collect documents; it does not seek to arrange a face-to-face interview.  *Id.* ("[W]e will be sending a representative to meet with you at your home to *collect documents* that will help us review your loan."); *id.* ("Our representative will *gather the required financial information*, as described in the attached checklist."); *id.* ("It is important that you have all the *documentation* ready when the representative comes to your home."); *id.* ("Once we have all your necessary financial *documentation*, we can evaluate your options and we will contact you to explain those options.") (emphasis added in all).

Second, Rourk was not sent a letter by the *Postal Service*. The September 14, 2011 letter was sent by FedEx Express, which does not comply with clear and unambiguous language of the regulation. 24 C.F.R. § 203.604 (d); *see also Mortg. Assocs. v. Smith*, No. 86-CV-1, 1986 U.S. Dist. LEXIS 16907, at *4 (N.D. Ill. Dec. 4, 1986) ("The controlling authority is the C.F.R. provision which plainly requires certified mail."); *Leatherbury v. Greenspun*, 939 A.2d 1284, 1288 (Del. 2007) ("[T]he term 'certified mail' has a common usage with only one meaning *that does not include delivery by Federal Express*.") (emphasis added).

The district court held that, "[w]hile a letter sent via Federal Express with delivery confirmation may not strictly comply with the certified mail requirement, it does substantially comply with the requirement that the letter be certified as having been dispatched." R-57 at 11-12.

But the district court had no basis to apply the doctrine of substantial compliance to this case. The doctrine of substantial compliance cannot apply because the language of the HUD regulation is clear and ambiguous. *See Bible v. Bible*, 259 Ga. 418, 419 (1989) (rejecting the argument that "service was . . . proper under the 'substantial compliance' rule" because the statute "means exactly what it states, and that service under this section must be made as provided"); *Young v. Martin Drilling & Blasting, Inc.*, 195 Ga. App. 133, 134 (1990) (physical precedent) (citing to *Bible* and explaining that "a rule couched in plain and

30

unambiguous language should not be susceptible to 'substantial compliance.'").

The doctrine of substantial compliance also cannot apply because compliance with HUD regulations is an express condition precedent. *See Travelers Cas. & Sur. Co. v. Dormitory Auth.*, 735 F. Supp. 2d 42, 74 (S.D.N.Y. 2010) ("Express conditions must be literally performed; substantial performance will not suffice."); *MXL Indus., Inc. v. Mulder*, 623 N.E.2d 369, 374 (Ill. App. Ct. 1993) ("The satisfaction of a condition is generally subject to the rule of strict compliance. Professor Williston explains, 'since an express condition depends for its validity on the manifested intention of the parties, it has the same sanctity as the promise itself.'") (citations omitted).

And the doctrine of substantial compliance cannot apply because a contractual right of foreclosure must be strictly construed. O.C.G.A. § 23-2-114 ("Powers of sale in deeds of trust, mortgages, and other instruments shall be strictly construed and shall be fairly exercised."); *DeFloria v. Walker*, 317 Ga. App. 578, 582 (2012) ("'[The Georgia Tort Claims Act] must be strictly construed.' Suffice it to say, substantial compliance is not strict compliance. Strict compliance is exactly what it sounds like; strict.").

Third, Rourk did not receive a *visit at her house* seeking to arrange a face-to-face interview. R-34-3 ¶ 68 ("I never received a personal visit at my home or anywhere else from either BANA or a company called Titanium Solutions."). In

31

response, Bank of America contends, and the district court agreed, that Titanium

Solutions visited "[Rourk's] home on three separate occasions" –September 22,

2011, September 23, 2011, and October 23, 2011.  R-57 at 12.

Yet, the district court disregarded that Bank of America's only evidence

comes from records created by Bank of America employees that were in turn based

solely on records created by Titanium Solutions.

There are two problems with Bank of America's evidence.

The evidence is inadmissible double-hearsay.  Even if the records from Bank

of America satisfy the business records exception, Bank of America presented no

evidence to show that the records from Titanium Solutions also satisfy the

exception.  No custodian or qualified witness provided testimony showing that the

records from Titanium Solutions satisfy the business records exception.  *See* Fed.

R. Evid. 803 (6)(D) (requiring that "all these conditions are shown by the

testimony of a custodian or another qualified witness"); *United States v. Bueno-*

*Sierra*, 99 F.3d 375, 379 (11th Cir. 1996) ("Rule 803(6) does not eliminate double

hearsay problems.").

Also, because the records could show only that a visit was made, there is no

evidence that visit was for the purpose of arranging a face-to-face interview.  After

all, the September 14, 2011 letter says only that a representative from Titanium

Solutions would visit Rourk's house to *collect documents*.  R-25-4 at 18.

32

Fourth, Bank of America *itself* did not send a letter to Rourk or make trip to see her at her house, nor did it attempt to arrange a face-to-face interview between a *Bank of America* employee and Rourk.  "The *mortgagee* must have a face-to-face interview with mortgagor, or make a reasonable effort to arrange such a meeting." 24 C.F.R. § 203.604 (b) (emphasis added).

And so, even if the September 14, 2011 letter had sought to arrange a face-to-face interview, even if sending the letter by FedEx were sufficient, and even if Rourk had received a visit at her house, none of those acts would show compliance with HUD regulations.  All of those attempts to contact Rourk were made by Titanium Solutions, and they sought to arrange some kind of contact between Titanium Solutions and Rourk – not between Bank of America and Rourk.

There are situations where a lender can appoint a third party agent to perform a lender's obligations under HUD regulations.  For example, there is a separate paragraph imposing additional requirements for mortgages on Indian land, and a lender "may appoint an agent to perform its responsibilities under this paragraph."  24 C.F.R. § 203.604 (e) (1); *compare* 24 C.F.R. § 203.604 (b) - (d) (involving general requirements) *with* 24 C.F.R. § 203.604 (e) (1) (imposing additional requirements for "mortgages insured pursuant to section 248 of the National Housing Act").

But no such provision exists for mortgages not on Indian land, and so Bank

33

of America cannot comply with HUD regulations by appointing a third party agent.

Indeed, the fact that HUD regulations expressly allow for a lender to appoint a

third party agent for mortgages on Indian land, but do not for other types of

mortgages, shows that the Secretary did not intend for a lender to satisfy its

obligations in this case by using a third party agent.  *Cf. EEOC v. Abercrombie &*

*Fitch Stores, Inc.*, 731 F.3d 1106, 1140 (10th Cir. 2013) ("[T]his natural reading of

the regulation is bolstered by the construction canon *expressio unius est exclusio*

*alterius* – the so-called 'negative-implication canon[.]").

Fifth, Bank of America did not make a *timely* effort to arrange to a face-to-

face interview.  A reasonable effort to arrange a face-to-face interview must take

place "before three full monthly installments due on the mortgage are unpaid."  24

C.F.R. § 203.604 (b).

In its June 22, 2010 reinstatement calculation, Bank of America informed

Rourk that she was "11 monthly payments . . . in default," which meant that Bank

of America considered Rourk's first unpaid monthly payment to have been for no

later than the August 2009 payment and three unpaid monthly payments would

have occurred by November 1, 2009.  R-25-2 at 26.  Titanium Solutions sent its

letter on September 14, 2011, and it recorded visits to Rourk's house on September

22, 2011, September 23, 2011, and October 23, 2011.  All of those attempts are

well past the November 1, 2009 deadline.

The district court held that Bank of America "considered Plaintiff's account current as of August 2010, assuming she would make up the four payments she acknowledged she needed to make.  Therefore, the Court finds that Defendant's attempts . . . were not untimely."  R-57 at 12.

There are two problems with the district court's holding.  First, the evidence shows that Bank of America still considered Rourk's account as in default as of August 2010.  In its August 12, 2010 notice of intent to accelerate, Bank of America informed Rourk that she was in "serious default" based on four unpaid monthly payments dating back to "05/01/2010."  R-25-2 at 52.  This is also confirmed by the May 8, 2012 letter sent by McGuire Woods, where Bank of America informed Rourk that "[a]s of August 31, 2010," "the Loan was delinquent in the amount of *four contractual monthly payments* (May, June, July, and August 2010)."  R-25-3 at 4 (emphasis added).

Second, even assuming Rourk's account was current as of August 2010, Bank of America still did not make a reasonable effort to arrange a face-to-face interview before the next three monthly installments went unpaid.  If Rourk's account was current as of August 2010, then three full monthly payments – September 2010, October 2010, and November 2010 – were unpaid by December 1, 2010.  Titanium Solutions sent its letter on September 14, 2011, and it recorded visits to Rourk's house on September 22, 2011, September 23, 2011, and October

35

23, 2011.  All of those attempts are also well past a December 1, 2010 deadline.

In sum, Rourk has put forth evidence establishing that, for at least *five* independent reasons, Bank of America did not make a timely and reasonable effort to arrange a face-to-face interview and, thus, did not comply with HUD regulations.

### C.    Bank Of America Is Liable For Breach Of Contract And Wrongful Foreclosure Even Assuming Rourk's Conduct Caused Her Default.

After incorrectly concluding that Bank of America had complied with HUD regulations, the district court also held that, "[e]ven if Defendant had not substantially complied . . . , it was Plaintiff's failure to tender a single payment for nearly two years that caused her default status and the foreclosure."  R-57 at 12.

This is yet another example of the district court's failure to distinguish between Rourk's *default* and Bank of America's *foreclosure* and to recognize that Rourk has certain claims that are separate from and do not depend on whether she caused her own default.  Even assuming Rourk's conduct caused her default, Bank of America could proceed with acceleration and foreclosure only if it first complied with HUD regulations.

The failure by Rourk to make a monthly payment is only one condition precedent to Bank of America's right to accelerate and foreclose.  The contract imposes a second condition.  It requires that, once there has been a default by

Rourk, Bank of America must comply with HUD regulations before proceeding

with acceleration and foreclosure.  Bank of America's right to accelerate and

foreclose accrues only when *both* conditions are satisfied.

Just like the duties imposed by RESPA, one reason for the condition that a

lender first comply with HUD regulations before proceeding with acceleration and

foreclosure is precisely so that, if a borrower is in default, the borrower can have a

meaningful opportunity to resolve any misunderstandings with the lender and can

discuss ways to prevent a default from turning into foreclosure.  To allow a lender

to proceed with acceleration and foreclosure without first complying with HUD

regulations would defeat the very purpose of having the condition in place.

And, just as it did with RESPA, the district court effectively created a

judicial exception in the contract between Rourk and Bank of America.  It held

that, if Rourk's conduct caused her default, Bank of America no longer had a duty

to satisfy the second condition precedent.  But the parties chose to expressly

impose two conditions on Bank of America's right, and so this Court should not

allow the district court to re-write the contract to get rid of the second condition.

As the Virginia Supreme Court explained in *Mathews*, "by its nature, the

deed of trust is a contract in which the parties have agreed that material breach of

the note by non-payment will not deprive borrowers of their rights to enforce the

conditions precedent."  724 S.E. 2d at 200.  "[P]rohibiting the borrower who has

37

breached from bringing an action to enforce the conditions precedent in a deed of trust would nullify such conditions.  The mere fact of the borrower's breach alone would become, de facto, the only condition precedent to foreclosure."  *Id.* at 199-200.

> And as the West Virginia district court explained in *Mullins*:

> [I]t would be illogical to conclude that a plaintiff who has fallen behind on payments could not sue a lender for the lender's failure to comply with applicable HUD regulations limiting the actions the lender may take when the borrower falls into arrearage.  To hold that the first breach rule precludes such a suit would effectively render the provision of the Deed of Trust requiring [the lender] to abide by HUD regulations ineffective and unenforceable.

2011 U.S. Dist LEXIS 35210, at *10.

> *Mathews* and *Mullins* are not the only cases to hold that "[b]orrowers may sue to enforce conditions precedent to foreclosure even if they were the first party to breach the note secured by a deed of trust through non-payment."  *Mathews*, 724 S.E.2d at 200.  Other courts have expressly agreed with or adopted the same reasoning used in *Mathews* and *Mullins*.  *See Kersey*, 682 F. Supp. 2d at 597; *Franklin*, 2011 U.S. Dist. LEXIS 7510, at *6-7; *Sinclair*, 2011 U.S. Dist. LEXIS 128220, at *27; *cf. Condel v. Bank of Am., N.A.*, No. 12-CV-212, 2012 U.S. Dist. LEXIS 93206, at *13 (E.D. Va. July 5, 2012).

> For those reasons, this Court should reverse the district court's order granting summary judgment to Bank of America on Rourk's breach of contract and

38

wrongful foreclosure claims.

### III. Bank Of America Is Liable For Breach Of Contract And Wrongful Foreclosure Because It Caused Rourk's Default.

As set forth in section two of this Argument, Georgia law provides for a breach of contract claim and the tort of wrongful foreclosure. A lender that breaches the contract provisions regarding foreclosure may, therefore, be liable for both breach of contract and wrongful foreclosure. *See Khadija*, 2012 U.S. Dist. LEXIS 181420, at *19.

Rourk's first basis for her breach of contract and wrongful foreclosure claims is that Bank of America failed to comply with HUD regulations. Rourk also has a second basis for her claims – Bank of America was the first party to breach the contract, and Rourk's subsequent inability to tender was caused and is excused by Bank of America's breach. This basis is separate from and does not depend on whether Bank of America complied with HUD regulations.

### A. Bank Of America Was The First Party To Breach The Contract, And Its Breach Caused Rourk's Default.

The Deed requires Bank of America to apply all monthly payments made by Rourk to the amounts she owes under the Deed. R-25-4 at 7 ("All payments under paragraphs 1 and 2 *shall be applied* . . . ."); R-25-4 at 3 ("[M]onthly payment . . . *shall be applied* to principal, interest and other items in the order described in the Security Instrument.") (emphasis added in both).

Bank of America breached this provision of the Deed when it failed to apply Rourk's payments during her bankruptcy. During her bankruptcy, Rourk paid off her pre-petition arrears with Bank of America and she made her required monthly payments of $394.83. R-25-2 at 4-10. Bank of America did not reject any of these payments; it never informed her that she was in default; and it never notified her of any change to her required monthly payment. R-34-3 ¶¶ 8-9. At the end of her bankruptcy, Rourk's trustee sent a letter to Bank of America describing in detail the payments made on Rourk's behalf. R-25-2 at 4-10.

Yet, when Rourk exited bankruptcy, Bank of America considered her in default. In its June 22, 2010 reinstatement calculation, Bank of America informed Rourk that she was in default for payments of $4,343.13 based on eleven monthly payments at $394.83 per month and she owed various improper fees. R-25-2 at 25-27. Bank of America now admits that it was wrong. R-25 at 53 ("Q. [Y]ou all are telling Jamie she is 11 payments behind . . . and that's not true, is it? . . . Yes. . . . Q. Yes, you are agreeing with me? A. Yes.").

Bank of America's failure to apply Rourk's payments during her bankruptcy and its decision to consider her in default caused a series of problems, all of which injured Rourk and eventually led to foreclosure. Bank of America first rejected Rourk's payments for April 2010, May 2010, and June 2010 pursuant to its policy of requiring certified funds when a borrower is in default. R-34-3 ¶¶ 10-18. On

40

this basis, Bank of America then imposed a series of improper fees, none of which were justified because Rourk had made all of her payments. *Id.* ¶¶ 19-29. Bank of America also required Rourk to pay the interest that accrued because of the rejected payments, which again was not justified because it was Bank of America's fault that Rourk's payments were not applied or accepted. R-25-3 (Loan History) at 6-38 (showing no credit or adjustment for interest accrued because of the rejected payments).

After Bank of America rejected Rourk's payments, imposed improper fees and charges, and required Rourk to pay accrued interest she should not have owed, Bank of America then initiated foreclosure proceedings. And because Bank of America had given her different and conflicting reinstatement calculations, Rourk could not reasonably determine on her own the amount she needed to pay to cure the default caused by Bank of America's misconduct and avoid foreclosure. R-34-3 (Rourk. Aff.) ¶¶ 94-95; *see also id.* ¶¶ 22-93.

## B.    Rourk's Subsequent Inability To Tender Was Caused And Is Excused By Bank of America's Breach.

The district court found that, even if Bank of America breached the contract by failing to apply Rourk's payments during her bankruptcy, Bank of America fixed the problem when it "credited Plaintiff's account to make it current as of the date she emerged from bankruptcy." R-57 at 2. The district court held that the "default and the ensuing foreclosure were caused by [Rourk's] failure to tender a

41

single payment after Defendant corrected her account in August 2010." *Id.* at 14.

But the district court improperly ignored how Bank of America's breach and continued misconduct *caused* Rourk's inability to tender payments after August 2010. Georgia law provides that, "[i]f the nonperformance of a party to a contract is caused by the conduct of the opposite party, such conduct shall excuse the other party from performance." O.C.G.A. § 13-4-23; *cf. Martin v. Rollins, Inc.*, 138 Ga. App. 649, 652 (1976) ("The *sequence* of these alleged defaults is important, and if . . . the contractor fell behind . . . then [they] would have breached the contract first and forfeited their right to insist that the other party to the contract comply strictly with its terms.") (emphasis added).

Rourk has put forth evidence establishing that Bank of America's breach and continued misconduct caused her inability to tender payments. After she exited bankruptcy, Rourk made payments for April 2010, May 2010, and June 2010. But Bank of America wrongly rejected those payments and informed Rourk that her account was in default and scheduled a foreclosure for August 2, 2010. R-34-3 (Rourk. Aff.) ¶¶ 10-18. After Rourk called Bank of America numerous times and had received three different and conflicting reinstatement calculations, McCalla Raymer finally sent her a letter saying that her account would be corrected on August 16, 2010 and that she would need to contact Paul Webb directly on or after August 16, 2010 to bring her account current. R-25-2 at 50.

42

And so that is what Rourk did.  Relying on her statutory right to make a

qualified written request to her servicer, Rourk wrote two letters to Webb – one on

August 31, 2010 and the other on December 1, 2011.  R-25-2 at 55-57; R-25-2 at

67-84.  Because she could not reasonably determine on her own the amount needed

to cure her default and avoid foreclosure, Rourk asked Webb specifically to

provide her with the amount needed to make her loan current.  But Webb did not

respond.  R-34-3 ¶ 94.  And so, even though Rourk was "ready, willing, and able to

pay whatever amounts were due to reinstate [her] Loan," she was unable to do so

because Bank of America did not provide her with information, which she only

needed in the first place because of Bank of America's breach and continued

misconduct.  *Id.* ¶ 95.

The district court concluded that Rourk should have simply paid Bank of

America monthly payments of $394.83 to bring her account current through

August 2010 and then continue paying $394.83 thereafter.  R-57 at 7.

Yet, none of Bank of America's notices establishes that, if Rourk had made

monthly payments of $394.83, Bank of America would have considered her

account current.  Indeed, each notice contained different and conflicting amounts.

For example, in the May 8, 2012 letter, McGuire Woods wrote that, "[a]s of

August 31, 2010, the Loan was delinquent $1,842.33 in principal, interest, and

escrow payments, plus $15.79 in late charges."  R-25-3 at 4.  They explained that

43

"the Loan was delinquent in the amount of four contractual monthly payments (May, June, July, and August 2010) plus late fees for three late monthly payments (May, June, and July 2010)." *Id.* If the May 8, 2012 response is accurate, then as of August 31, 2010, Rourk needed to pay **$1,858.12** to reinstate her loan – not the $1,370.73 in the August 12 notice, the $989.73 in the August 11 notice, or the $2,535.76 in the June 22 notice.

Rourk could not simply add up her monthly payments of $394.83 and expect that amount to be sufficient, even assuming she could figure out how many months Bank of America considered her to be behind.  The $1,842.33 in principal, interest, and escrow payments owed as of August 30 is $263.01 *more than* the four monthly payments Bank of America says Rourk owed.  Nor could Rourk reasonably determine on her own the $15.79 in late fees Bank of America says she owed because those fees also had somehow changed from the August 12 notice.

Rourk was also reasonably concerned that, if she made a payment without getting explanation from Bank of America, she could end up paying for improper fees and accrued interest she did not owe and Bank of America could still foreclose on her home.  In fact, that is precisely what Bank of America said could happen. "[I]f less than the full amount that is due is sent to us, we can keep the payment and apply it to the debt *but still proceed to foreclosure* since the default would not have been cured."  R-25-2 at 52 (emphasis added); *see also* R-56 at 85 ("[Judge

44

Land]: . . . I could see the case where there's a dispute about what she owes and there being evidence that even if she'd sent in the amount that admittedly was owed, they would have still foreclosed.").

And contrary to the district court's assumption, Bank of America did not "correct[] Plaintiff's account in August 2010," such that she could simply make payments of $394.83 and expect that to be sufficient.  R-57 at 6.  As its May 8, 2012 letter confirms, Rourk needed to pay more than her regular monthly payments to bring her account current, Bank of America still had assessed "late fees" caused by its own improper rejection of Rourk's payments after she emerged from bankruptcy, and Bank of America did not correct the interest that unfairly accrued because of those rejected payments.  R-25-3 at 4.

Rourk was thus in an unreasonable situation created by Bank of America's breach and misconduct, and these facts establish two separate reasons why Bank of America's breach excuses Rourk's subsequently inability to tender.

First, Rourk was "ready, willing, and able to pay whatever amounts were due to reinstate [her] loan" and her offer to do so is sufficient, even if she did not actually tender that amount.  R-34-3 ¶ 95; *see id.* ¶ 79; R-25-2 at 77 (letter from Rourk's lawyer stating that "Jamie is prepared to send you a cashier's check for the April through July payments.").

For example, in *Grebel*, a lender foreclosed based on the borrower's failure

45

to tender a cashier's check for $185,647.22, which included over $50,000 for

unearned interest demanded by the lender. *Grebel v. Prince*, 232 Ga. App. 361,

361 (1998). The borrower refused to pay the unearned interest and submitted

testimony that he offered to pay the amount minus the unearned interest, which

turned out to be $130,992.47. *Id.* at 363. The Georgia Court of Appeals agreed

with the borrower and held that the offer was sufficient. It reached this conclusion

even though the borrower did not actually tender the amount admittedly owed,

which the borrower could not determine on his own:

> Q. Did anyone at anytime . . . communicate to [the lender] or any of
> his agents . . . that we stand ready, willing, and able to pay
> $130,992.47?
> A. Not specifically that amount – we stated repeatedly *we stand
> ready, willing and able to pay* principal, interest, fifteen percent
> attorney's fees, costs because at that time, *we did not know what those
> were*.
>
> . . .
>
> A. . . . [We] sa[id] we were ready, willing and able to pay. *Once you
> tell me what that figure is, we have the money and we will certainly
> pay it . . . . Did I actually go with a check with the exact amount that
> was owed to [the lender]? No I did not.*

*Id.* at 363-64 (emphasis added).

Second, Rourk's inability to tender is also excused by Bank of America's

breach and misconduct, which prevented Rourk from learning the amount needed

to cure her default and avoid foreclosure. R-34-3 ¶ 94 ("Despite my numerous

calls and letters to BANA and its attorneys in 2010 and 2011, I never received a

46

verified, full amount due to reinstate my Loan prior to foreclosure.").

For example, in *Catalan*, a lender argued that the borrowers could not

maintain a breach of contract claim based on misapplied payments because the

borrowers "breached the contract first when they failed to remit their October 2004

payment."  *Catalan v. GMAC Mortg. Corp.*, 629 F.3d 676, 691 (7th Cir. 2011).

The borrowers countered that they did not pay because of the lender's "repeated

failures to provide them with information regarding their account or to conduct an

investigation into the errors in transferring their account."  *Id.* at 692.  The Seventh

Circuit agreed with the borrowers, explaining that "[a] reasonable trier of fact

could find that the plaintiffs' failure to remit their October 2004 payment in a

timely manner, although a breach of the contract, was excused due to the lender's

earlier breaches and errors and the resulting confusion surrounding their account."

*Id.* at 692; *see also McGinnis v. Am. Home Mortg. Servicing Inc.*, No. 11-CV-284,

2013 U.S. Dist. LEXIS 92556, at *53-*54 (M.D. Ga. July 2, 2013) ("[B]ased on

this tragedy of errors, a reasonable jury could also conclude that . . . [the lender's]

failure to timely notify Plaintiff and subsequently correct its error caused Plaintiff

to default on her Loan obligations.").

In sum, Bank of America was the first party to breach the contract, and its

breach caused Rourk's default.  Moreover, Rourk's subsequent inability to tender

was caused and is excused by Bank of America's initial breach and misconduct.

47

For those reasons, this Court should reverse the district court's order granting

summary judgment to Bank of America on Rourk's breach of contract and

wrongful foreclosure claims.

### IV. Bank Of America Is Liable For Conversion Because It Misapplied Payments And Retained Proceeds From A Wrongful Foreclosure.

Georgia law provides for the tort of conversion.  "Conversion consists of 'an

unauthorized assumption and exercise of the right of ownership over personal

property belonging to another, in hostility to his rights; an act of dominion over the

personal property of another inconsistent with his rights; or an unauthorized

appropriation."  *Md. Cas. Ins. Co. v. Welchel*, 257 Ga. 259, 261 (1987).  A

borrower can assert a claim for conversion under Georgia law where a lender fails

to properly apply the borrower's mortgage payments.  *See, e.g.*, *Johnson v.

CitiMortgage, Inc.*, 351 F. Supp. 2d 1368, 1372 (N.D. Ga. 2004).

Rourk has two separate claims for conversion – one for Bank of America's

failure to apply Rourk's payments during her bankruptcy, and the other for Bank of

America's retention of proceeds from a wrongful foreclosure.  Either is sufficient

to establish that Bank of America is liable for conversion.

As to the first claim, Rourk has set forth evidence establishing that Bank of

America committed conversion by failing to apply Rourk's payments during her

bankruptcy.  During her bankruptcy, Rourk paid off her pre-petition arrears with

Bank of America and she made her required monthly payments of $394.83.  R-25-

2 at 4-10.  Yet, despite paying off her pre-petition arrears and making her required monthly payments, by June 22, 2010, Bank of America considered Rourk in default on eleven monthly payments at $394.83 per month.  R-25-2 at 25-27.

It appears that Bank of America eventually applied the payments Rourk made during her bankruptcy.  For example, Rourk's loan history shows that, all on August 11, 2010, Bank of America made "REGULAR PAYMENTS" and "MISC. POSTINGS," which cover payment periods from August 2009 through April 2010. R-25-3 at 36.  But that does not extinguish Rourk's conversion claim.  *See, e.g.*, *Berry v. United of Omaha*, 719 F.2d 1127, 1129 (11th Cir. 1983) ("[P]rior return of the property to the plaintiff does not bar a suit for conversion.").

Rourk's claim for conversion was complete when her trustee sent a letter to Bank of America showing all of the required monthly payments made on behalf of Rourk during her bankruptcy and Bank of America responded by placing Rourk in default for failure to make eleven monthly payments.  Even if it eventually applied those payments, Bank of America's initial failure to do so and its decision to consider Rourk in default caused a series of problems, all of which injured Rourk and eventually led to foreclosure of her home.

The district court held that "there is no evidence to support this speculative conclusion."  R-57 at 15.

But the trustee's letter describing the payments made on Rourk's behalf,

Bank of America's June 22, 2010 notice, and Rourk's loan history establish that that Bank of America failed to apply Rourk's payments during her bankruptcy. The trustee's letter confirms that Rourk made all required monthly payments of $394.83 during her bankruptcy. R-25-2 at 4-10. The June 22, 2010 notice shows that Bank of America considered Rourk in default on eleven monthly payments, which means that Bank of America did not have payments from Rourk dating back to August 2009. R-25-2 at 25-27. And Rourk's loan history shows that, all on August 11, 2010, Bank of America made payments and miscellaneous postings covering August 2009 through April 2010, which is nine of the payment periods addressed in the June 22, 2010 notice, with May 2010 and June 2010 being the tenth and eleventh payment periods Bank of America considered Rourk to be in default. R-25-3 at 36.

In other words, the evidence shows that Bank of America did not apply payments by Rourk from August 2009 through April 2010, which constituted nine payment periods. It appears that Bank of America applied those nine payments on August 11, 2010, but only after that initial misapplication of payments put Rourk in default and subjected her to a series of problems, all of which injured her and eventually led to foreclosure of her home.

The district court also appeared to agree with Bank of America's contention that Rourk's account was in default when she exited bankruptcy because of an

50

escrow deficiency, not because of misapplication of payments.  R-57 at 16 n.2.

But Rourk can only be in default for failure to make a required *monthly* payment, and the trustee's letter confirms that Rourk made all of her required monthly payments.  R-25-4 at 9 (providing that "Borrower defaults by failing to pay in full any monthly payment required by this Security Instrument").  If an escrow shortage or deficiency arises, Bank of America may choose to either do nothing or it may require Rourk to pay the deficiency.  *See* 24 C.F.R. § 3500.17 (f)(4).  But if Bank of America wanted Rourk to pay the deficiency, it was required to give Rourk proper notice of the escrow deficiency and to increase Rourk's monthly payment.  24 C.F.R. § 3500.17 (f)(4) - (5).  Bank of America chose to do neither, and thus it could not consider Rourk to be in default based solely on the *existence* of an escrow deficiency.  Moreover, and perhaps most tellingly, the escrow deficiency as of the June 22, 2010 notice was only $770.03, which is far less than the eleven monthly payments at $394.83 per month that Bank of America told Rourk she was in default.  R-25-2 at 25-27.

As to the second claim for conversion, Rourk has set forth evidence – explained in sections two and three of this Argument – establishing that Bank of America wrongfully foreclosed.  Thus, any proceeds retained by Bank of America, other than proceeds for properly accrued monthly payments and interest, should have been returned to Rourk.

51

For those reasons, this Court should reverse the district court's order granting summary judgment to Bank of America on Rourk's conversion claims.

## V. This Court Should Remand This Case To The District Court For Further Proceedings.

In the district court, Rourk moved for partial summary judgment in its favor on Bank of America's liability. And so, in addition to reversing the district court's order, Rourk requests that this Court also remand with instructions for the district court to enter an order finding Bank of America liable on Rourk's claims and to try the issue of damages to a jury. Alternatively, Rourk requests that this Court reverse the district court and remand for all issues to be tried to a jury.

## CONCLUSION

For those reasons, this Court should reverse the district court, vacate the district court's judgment, and remand the case for further proceedings.

This brief is submitted on December 30, 2013.

**/s/ Naveen Ramachandrappa**

Michael B. Terry
Ga. Bar No. 702582
Naveen Ramachandrappa
Ga. Bar No. 422036
BONDURANT MIXSON &
ELMORE LLP
1201 W Peachtree St NW
Ste 3900
Atlanta, GA 30309
404-881-4100
terry@bmelaw.com

52

ramachandrappa@bmelaw.com

Charles A. Gower
Ga. Bar No. 303500
Miranda J. Brash
Ga. Bar No. 475203
CHARLES A. GOWER, P.C.
1425 Wynnton Rd
PO Box 5509
Columbus, GA 31906
706-324-5685
charlie@cagower.com
miranda@cagower.com

**Attorneys for Jamie Rourk**

53

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains a total of 12,966 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and 11th Cir. R. 32-4.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word with size 14 Times New Roman font.

This certification is made on December 30, 2013.

**/s/ Naveen Ramachandrappa**

54

## CERTIFICATE OF SERVICE

I certify that I have served a copy of **JAMIE ROURK'S BRIEF** by email

and US mail on the following counsel of record:

Robert A. Muckenfuss
Jodie N. Herrmann
Lauren Byers Loftis
MCGUIRE WOODS LLP
201 N Tyron St
Ste 3000
Charlotte, NC 28202
704-343-2329
rmuckenfuss@mcguirewoods.com
jherrmann@mcguirewoods.com
lloftis@mcguirewoods.com

Andrew G. Phillips
MCGUIRE WOODS LLP
1230 Peachtree St NE
Ste 2100
Atlanta, GA 30309
404-443-5724
aphillips@mcguirewoods.com

This certification is made on December 30, 2013.

**/s/ Naveen Ramachandrappa**